UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,	No. 13-cr-194 (MJD/LIB)

        Plaintiff,

v.	**REPORT AND RECOMMENDATION**

Ryan Devin Ravensborg,

        Defendant.

This matter came before the undersigned United States Magistrate Judge upon the parties' pretrial motions. This case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on September 17, 2013, regarding the parties' pretrial discovery motions,[1] Defendant's Motion to Amend Conditions of Pretrial Release, [Docket No. 25],[2] and Defendant's Motion to Suppress Statements, [Docket No. 26]. For reasons outlined below, the Court recommends that Defendant's Motion to Suppress be **DENIED**.

**I.    DEFENDANT'S MOTION TO SUPPRESS [DOCKET NO. 26]**

Defendant moves the Court for an order suppressing all statements, admissions, and answers provided during Defendant's July 30, 2013, custodial interview with the FBI following his arrest. Defendant argues that he did not voluntarily, knowingly, and intelligently waive his Miranda[3] rights, and, as such, the Court should exclude all statements from evidence at trial for violation of his rights under the Fifth Amendment.

___
[1] The Court addressed the parties' discovery motions in a separate Order, [Docket No. 30].
[2] At the September 17, 2013 hearing, Defendant moved to stay his Motion to Amend Conditions of Pretrial Release, [Docket No. 25], while reserving his right to revisit it at a later date. The Government did not oppose. The Court granted Defendant's motion to stay from the bench.
[3] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

A.   **Facts**[4]

On the morning of July 30, 2013, FBI Special Agent Matthew Zavala ("SA Zavala") arrested Defendant and took him into custody upon execution of a federal arrest warrant. SA Zavala, another agent, and local task force personnel arrived at Defendant's mother's home, where they found and arrested Defendant. SA Zavala secured Defendant, informed Defendant that he was under arrest pursuant to a federal arrest warrant, and took him to the Beltrami County Jail in Bemidji, Minnesota. No conversations took place, nor were any statements taken, during the forty-minute car ride to the jail.

Upon arriving at the Beltrami County Jail, SA Zavala took Defendant to an interview room to provide Defendant with the opportunity to talk to him. Defendant and SA Zavala were seated across from one another, and a second agent, FBI Special Agent Charles Bonser ("SA Bonser"), stood to the side. Both agents were unarmed and dressed in plain clothes. During his testimony, SA Zavala described Defendant's demeanor as quiet, sober, and aware; Defendant gave no indication that he was injured or in need of assistance. SA Zavala read Defendant his <u>Miranda</u> rights and provided Defendant with a copy of the FBI's Advice of Rights form (FD-395, submitted as Government's Ex. 2). SA Zavala recorded the interview, the first three-and-a-half minutes of which are transcribed below:

> MZ: This is Special Agent Matt Zavala of the FBI. Today's day is July 30, 2013, the time is approximately 10:37 a.m. I have with me, uh, Special Agent Charlie Bonser, and, Ryan, can you just say your name and date of birth, please?
>
> **RR: My name is Ryan Ravensborg. My birthday is October 9, 1992.**
>
> MZ: Alright. Ryan, I'm going to go over your rights with you to make sure you understand them. Ryan, before we have any, uh, conversations with you

---

[4] The facts are derived from the testimony of Special Agent Matthew Zavala of the FBI ("SA Zavala") and from Government's Ex. 1: audio recording of the July 30, 2013, custodial interview of Defendant, conducted by SA Zavala.

about anything, uh, I want to make sure you understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer any questions now without a lawyer present, you have the right to stop answering questions at any time.

Do you understand what I've read to you?

[silence]

Ok. If you do want to talk to me, you can read this form if you want, you can sign right there, uh, and then we can talk about why I came and got you this morning.

**RR: What is this thing for?**

MZ: That's just to make sure you know what your rights are, and that if you do decide you want to talk to me, you just sign that saying that you agree you want to talk to me. It's all up to you.

**RR: What if I don't?**

MZ: It's your right. But I will let you know that, you know, I talked to, you know I talked to your brothers, I talked to your mom, right, and I told them all at the time, you know, I did want to talk to you. And you, you could have reached out to me at any time to talk to me, and we could have done this, you know, at your home, at your mom's home, at your brother's house, wherever. Unfortunately, it's got to the point now where now, now I had to put you in cuffs, ok? But I'm still going to give you the opportunity to talk to me, if you want. But that's your call.

**RR: Well, I really have nothing to say.**

MZ: Ok. Well, I mean, we can, we can have a conversation about why you're here, if you want. But, um, you know, I mean, if you've got nothing to say … I mean, you know why you're arrested here today, right?

**RR: Not really.**

MZ: Do you, um, alright, well. Clearly you were at your mom's house, right, this morning? Is that normally where you live?

**RR: [quietly] No.**

3

MZ: Where do you normally live?

RR: **My girlfriend's house.**

MZ: Christina, is that her name?

RR: **Christine.**

MZ: Christine. Is that Oakgrove, is that her last name? [silence] Yeah. Where does she live?

RR: **She lives, like, a few blocks from my house.**

MZ: Yeah. We had, uh, we had people at a couple different addresses, hers was one of them. Obviously your mom's house, where we found you. Um, did you know, did you think it was Red Lake that was coming to look for you? Or did you know it was FBI that was looking for you?

RR: **I seen somebody jump out, and it said FBI right on his…[trails off]**

MZ: Yeah. I wish you wouldn't have run the way you did.

RR: **[inaudible] I get scared when I see cops. I don't like cops.**

(Government's Ex. 1.)

The entire interview lasted for approximately 25 minutes. From the audio recording, it is evident that SA Zavala properly administered <u>Miranda</u> warnings. Upon asking Defendant whether he understood his rights, the audio indicates a beat of silence, followed by SA Zavala's "Ok" (approximately 1:06 minutes into the interview). SA Zavala testified that during the beat of silence, Defendant nodded his head that, yes, he understood his rights. SA Zavala testified that nothing indicated that Defendant did not understand; Defendant was lucid, attentive, and responsive. SA Zavala was measured and calm throughout the interview; he made no threats or promises, nor does the interview indicate any hint of coercion, deceit, or other indicators of force or manipulation. At no point did Defendant seek to stop the interview or ask for an attorney.

    **B.**    **Defendant did not invoke his Fifth Amendment right to remain silent.**

4

Because Defendant was in custody[5] during the interview on July 30, 2013, and because SA Zavala properly administered Miranda warnings,[6] the first question the Court addresses is whether Defendant invoked any of his Miranda rights. At issue in the present case is only the question of whether Defendant invoked his Fifth Amendment right to remain silent.

1.  **Standard of Review**

An invocation of the right to remain silent must be clear and unequivocal, and such an invocation must be "scrupulously honored" by interrogating officers. Michigan v. Mosley, 423 U.S. 96, 104 (1975). In Berghuis v. Thompkins, 560 U.S. 370, 130 S. Ct. 2250 (2010), the Supreme Court held that an invocation of the right to remain silent cannot be ambiguous or equivocal, as "[t]here is no reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel . . . ." (Id. at 2260.) "A suspect invokes his right to remain silent by making 'a clear, consistent expression of a desire to remain silent.'" United States v. Ferrer-Montoya, 483 F.3d 565, 569 (8th Cir. 2007) (citing United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989)). "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of Miranda." Ferrer-Montoya, 483 F.3d at 569. Specifically, the Eighth Circuit has held that a defendant's evasive or reluctant behavior is

---

[5] A person is "in custody" for the purposes of Miranda if the individual has been arrested. Stansbury v. California, 551 U.S. 318, 322 (1994).

[6] Miranda established a warning that must be given to suspects before the suspects may be subjected to custodial interrogation. A suspect in custody must be advised as follows:

> "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S., at 479, 86 S.Ct. 1602.

Berghuis v. Thompkins, 560 U.S. 370, 130 S. Ct. 2250, 2259 (2010). Government's Ex. 1, the audio recording of Defendant's twenty-five minute custodial interview, demonstrates that SA Zavala properly informed Defendant of his rights, as required by Miranda.

5

insufficient to invoke the right to remain silent. Id. (citing Mann v. Thalacker, 246 F.3d 1092, 1100 (8th Cir. 2001)).

### 2. Discussion

The only time Defendant might have arguably invoked his right to remain silent was by his statement, "Well, I really have nothing to say," approximately two minutes and eleven seconds into the interview. On its face, the statement is neither a direct nor explicit statement that Defendant wanted to stop the interview and remain silent. Rather, the statement is susceptible to multiple reasonable interpretations.

Eighth Circuit case law has held that statements by other defendants very similar to the one now at issue indicating that a defendant has nothing really to say have been insufficient to invoke one's right to remain silent. In Ferrer-Montoya, officers arrested the defendant after finding two packages of methamphetamine in his vehicle. Id. at 567. As in the present case, the officer verbally informed the defendant of his Miranda rights and gave the defendant a written copy of the rights. Id. The defendant said he understood his rights, and the officer asked the defendant whether he wanted to say anything. Id. The defendant replied, "[I] told you before . . . . I just told you what I know . . . . What else can I say?" Id. Following this exchange, the officer drove the defendant to a highway patrol post where he met with state narcotics agents. Id. During the twenty-minute car ride, the defendant answered basic questions from the officer, and, upon arriving at the highway patrol post, the defendant cooperated in answering substantive questions by the narcotics agents. Id. at 568, 569. The District Court held, and the Eighth Circuit affirmed, that the defendant had not invoked his right to remain silent. Id. at 569. Rather, the defendant merely declined to answer questions during the time period between his comment implying that he had nothing else to say and the time that he began answering basic questions from the officer.

"'What else can I say?' does not constitute an unequivocal expression of a desire to remain silent." Id.

Additionally, in an unpublished decision from the District of North Dakota, the court held that a defendant's statement, "I have nothing to say to him," followed even by the defendant's departure from the interview room, was insufficient to invoke the right to remain silent. United States v. Demarce, No. 2:07-cr-64, 2007 WL 4276561, at *3 (D.N.D. Nov. 26, 2007). Citing to Ferrer-Montoya, the court concluded that the statement was insufficiently clear, and, even coupled with the defendant's declination to answer specific questions, insufficient to constitute an invocation of the right to remain silent. Id. (citing Ferrer-Montoya, 438 F.3d at 569).

As in Ferrer-Montoya and Demarce, Defendant's statement in the present case is insufficiently clear to constitute an unequivocal invocation of his Fifth Amendment right to remain silent. The Supreme Court has identified that clear statements that the suspect wanted to remain silent or that he did not want to talk with the police would constitute "simple, unambiguous statements" sufficient to constitute an invocation of the right to remain silent. Thompkins, 130 S. Ct. at 2260. However, Defendant here made no such simple, unambiguous statements indicating he wished to exercise his right to remain silent during the course of his custodial interview by SA Zavala.

    C.    **Defendant waived his Fifth Amendment right to remain silent.**

    1.    **Standard of Review**

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement." Thompkins, 130 S. Ct. at 2260 (citing North Carolina v. Butler, 441 U.S.

369, 373 (1979)). The Court's waiver inquiry involves two analyses: first, waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and second, waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The Government bears the burden of demonstrating that a defendant voluntarily, knowingly, and intelligently waived his right to remain silent. Miranda, 384 U.S. at 475.

Proper waiver may exist even absent express statements of waiver. Thompkins, 130 S. Ct. at 2261. "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." Id. (citing Bulter, 441 U.S. at 376). Thus, if the Government establishes that law enforcement properly administered Miranda warnings, that the suspect subsequently made uncoerced statements, and the suspect understood his Miranda rights, the Government has made a sufficient showing of implicit waiver. Thompkins, 130 S. Ct. at 2261.

"Although Miranda imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a Miranda warning, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights." Id. (internal citations omitted). Generally speaking, a court may "presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Id.; see, e.g., Butler, 441 U.S. at 372-376; Colorado v. Connelly, 479 U.S. 157, 169-170 (1986). A defendant may waive Miranda rights by means less formal than a typical waiver on the record in a courtroom, cf. Fed. R. Crim. P. 11, "given the practical constraints and

necessities of interrogation and the fact that Miranda's main protection lies in advising defendants of their rights." Thompkins, 130 S. Ct. at 2262 (internal citations omitted).

In evaluating a defendant's waiver, courts consider the totality of the circumstances surrounding the waiver. Moran v. Burbine, 475 U.S. 412, 421 (1986). Courts consider factors such as the defendant's intelligence, education, age, familiarity with the criminal justice system, and explicitness of the waiver. United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011).

**2. Discussion**

Because nothing in the record suggests that voluntariness is at issue, the Court focuses its analysis on whether Defendant knowingly and intelligently waived his Fifth Amendment right to remain silent.

Two facts here need to be considered in assessing whether there was a waiver. First, Defendant's acknowledgement that he understood his rights was non-verbal. Second, SA Zavala's explanation of the effect of signing the Advice of Rights form was somewhat confusing.

As to the first fact, nothing in the record contradicts SA Zavala's testimony that Defendant nodded "yes" in response to the question, "Do you understand what I've read to you?"; as a result, this Court finds that Defendant indicated that he understood his rights. See United States v. Yockey, 654 F. Supp. 2d 945, 954 (N.D. Iowa 2009) (holding that the defendant's non-verbal head-nod in response to an interviewing officer's question after reading Miranda warnings was sufficient to constitute an affirmative response).

In most cases where there is a showing of properly administered Miranda warnings, the absence of coercion, and the defendant's admitted understanding of his rights, there would be a sufficient showing of waiver of rights. However, here the Court must also consider the second

fact of SA Zavala's somewhat confusing characterization of the effect of signing the Advice of Rights form, which Defendant did not sign.

The audio recording (Government's Ex. 1) reveals that SA Zavala's explanation may be interpreted as implying that Defendant's signature could be a pre-condition to agreeing to talk:

**RR: What is this thing for?**

MZ: That's just to make sure you know what your rights are, and that if you do decide you want to talk to me, you just sign that saying that you agree you want to talk to me. It's all up to you.

**RR: What if I don't?**

MZ: It's your right. But I will let you know that, you know, I talked to, you know I talked to your brothers, I talked to your mom, right, and I told them all at the time, you know, I did want to talk to you. And you, you could have reached out to me at any time to talk to me, and we could have done this, you know, at your home, at your mom's home, at your brother's house, wherever. Unfortunately, it's got to the point now where now, now I had to put you in cuffs, ok? But I'm still going to give you the opportunity to talk to me, if you want. But that's your call.

Although by his first sentence "It's your right," SA Zavala may have confusingly implied that a signed form would serve as Defendant's means of agreeing to talk, the law requires neither a signed form nor an explicit oral waiver of <u>Miranda</u> in order for there to be an effective waiver.[7] <u>United States v. House</u>, 939 F.2d 659, 662 (8th Cir. 1992) (holding that although the defendant did not sign the wavier form, he proceeded to answer questions presented by the officers, and the refusal to sign was not the equivalent of a statement indicating that the defendant did not wish to answer question). In the present case, by his earlier head nod, Defendant affirmatively acknowledged that he understood his rights, and he proceeded to answer SA Zavala's questions entirely voluntarily, and this voluntary conduct was contrary to the right of which he'd

---

[7] The whole of SA Zavala's response to Defendant's inquiry about what if he didn't sign the Advice of Rights form, when not limited to just the first sentence, makes clear that Defendant would still have the opportunity to speak to SA Zavala and that whether or not to do so was Defendant's call.

previously been informed. As a result, the Court finds that Defendant knowingly and intelligently waived Miranda.

## II. CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 26] be **DENIED**.

Dated: 9/30/2013

s/Leo I. Brisbois  
The Honorable Leo I. Brisbois  
United States Magistrate Judge

**N O T I C E**

Due to Defendant's Motion for Continuance of the Motion Filing and Hearing Dates and subsequent Order, [Docket No. 17, 19], and in light of the pending trial date of October 21, 2013, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by October 7, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections **by October 14, 2013**. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.